# Exhibit 1

REPUBLIKA E SHQIPERISE                          **NR. REP: 1580**
DHOMA E NOTERISE TIRANE

**VERTETIM I NJESISE ME ORIGJINALIN**

Sot, me date 05.04.2016(dymije e gjashtembedhjete), ne Dhomen e Noterise Tirane
dhe para meje noteres se kesaj dhome te quajtures **Violeta Sulkaj**, me seli ne
rrugen "Muhamet Gjolleshi", Tirane, u paraqit personalisht:

**Shoqeria Albtelecom Sha,** me seli ne rrugen "Myslym Shyri" nr 42 Tirane dhe  i
pajisur me nr **NIPT J61824053N** e perfaqesuar nga **Diana Biba**,  e bija Kozma-it,
e dtl 24.05.1980, banuese  Tirane  dhe e pajisur me mjet identifikimi,nr.
**I05524011H**, e cila më kërkoi të vërtetoj me origjinalin fotokopjen e:

   - **Marreveshje me date 08.02.2016.**

Për të cilën pasi bëra krahasimin e përmbajtjes së dokumentit të nxjerrë nga
dokumenti origjinal dhe rezultoi se nuk ka korigjime, shtesa apo fshirje e shenja të
tjera, e vërtetoj njësinë me origjinalin në bazë të nenit 56 të ligjit 7829 datë
01.06.1994 ' Për Noterinë' dhe 'Udhëzimit të Ministrit te Drejtësisë' me nr 6291
datë 17.08.2005 pika 3, 4, 7.

                                                      NOTERE
                                                  Violeta Sulkaj

**REPUBLIC OF ALBANIA**
**CHAMBER OF NOTARY OF TIRANA**                   No  REP1580

                    **CERTIFICATION**

Today, on 05.04.2016(two thousend sixteen) in the Notary Chamber of Tirana and
in my presence as the Public Notary, **Violeta Sulkaj** with my offce in "Muhamet
Gjollesha", Tirana is presented:

**Society "Albtelecom" sh.a the TIN number J61824053N,** headquartered in
Tirana, represented by **Diana Biba**, doghter of Kozmas , date of birth 24.05.1980,
and resident in Tirana, who requested to verify the copy with original of document
attached.
I notary public personally certify the signatures made ouside of this office according
to the law.

                                              **Public Notary**
                                              **Violeta Sulkaj**
                                   **Signature/Seal/Offical Stamp**

# APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1. Country: Republic of Albania

This public document
2. has been signed by: Violeta Sulkaj
3. acting in the capacity: Notar
4. bears the seal/stamp of: Public Notary of Tiranë

Certified
5. at Tirana                    6. the 11 May 2016
7. by Ministry of Foreign Affairs
8. No: 1240676
9. Seal/stamp:          10. Signature: Najada SOJLI
                              *Counsellor*







AGREEMENT ON

INTERNATIONAL TELECOMMUNICATIONS SERVICES

BETWEEN

ALBTELECOM sh.a.

AND

UNIFI Communications, Inc

INTERNATIONAL TELECOMMUNICATIONS SERVICES AGREEMENT
BETWEEN
ALBTELECOM
AND

UNIFI

This Agreement is entered into upon the date of its execution (hereinafter referred to as the "Effective date"),

By and between

UNIFI Communications, Inc  a company fully owned by UNIFI Holdings, Inc organized an existing under the law of New York State and having its registered office at 245 Park Avenue 24th Floor New York NY 10167, (hereinafter referred to as "UNIFI", which expression includes its successors)

And

Albtelecom sh.a., a company organized an existing under the law of Albania, and having its registered office at Rr. Myslym Shyri, 42 Tirana, Albania (hereinafter called "ALBTELECOM", which expression includes its successors)

Collectively referred to as "the Parties" and individually referred to as" the Party".
WHEREAS

UNIFI is a Corporation duly authorized by the New York State Laws and fully licensed by FCC Authority for the establishment and operation of a public network and for the provision of all international telecommunication services;

ALBTELECOM is a Corporation duly authorized for the establishment and operation of a public network and for the provision of all international telecommunication services;

UNIFI and ALBTELECOM desire to provide international telecommunications services between UNIFI and Albania.

NOW THEREFORE THE PARTIES HAVE AGREED the following:

1.   SCOPE:
The Parties agree to establish a direct link for international telecommunications services between Albania and the rest of the World as well as to provide operation and maintenance of the necessary facilities for the service implementation in accordance with the terms and conditions specified in this Agreement and in the relative Appendices.

2.   APPENDICES:
The classes of international telecommunications services the Parties have agreed upon to provide, as well as other services, as may be agreed, from time to time, to be provided in the future, are stated in the Appendices, which form an integral part of this Agreement. Any changes, revisions and possible extensions of these services, as may be agreed from time to time by the Parties, shall be specified in additional Appendices duly signed by both Parties. Appendices may be negotiated and altered at any time independently of this Agreement.

3. RATES:

The Accounting Rates for communication services between Albtelecom and UNIFI shall be divided as agreed between the Parties according to the Appendices.

Review of the Accounting Rates will be in accordance with the principles set out in the Appendices. If the Parties fail to reach agreement on rates, this Agreement can be terminated upon 3 months written notice of either Party.

The rates referred to in the above sub-sections are exclusive of value added tax and of any other sales taxes, duties or levies imposed by any authority, government or government agency. Each Party shall be responsible for taxes and similar charges levied by its own country or political subdivision of thereof.

Collection rates shall be a national matter

4. ACCOUNTING STATEMENTS:

In accordance with the in force ITU-T Recommendations and the International Telecommunications Regulations Final Acts both Parties shall prepare exchange and accept monthly statements and all relevant information regarding incoming and outgoing traffic for the communication services stated in the Appendices of this Agreement. In case of objections, additions or corrections concerning the above monthly statements and information, both Parties shall use their best endeavors to settle the pending question as soon as possible.

Each of the Parties shall preserve all records of international calls for the last 3 years, which are required to prove the calculations of its monthly statements. Either Party shall present for inspection by the other Party all accounts or payment data as well as the detailed information on calls concerning all services stated in this Agreement.

5. INVOICING. PAYMENTS AND LATE PAYMENTS CHARGES

5.1 Each Party shall issue a monthly invoice for the Services provided pursuant to this Agreement, which will be calculated on the basis of data collected by the billing Party, and send it to the other Party as soon as possible after the end of the calendar month to which the invoice relates. Such invoices shall be based on the chargeable duration of the calls routed pursuant to this Agreement.

5.2 In accordance with in force ITU-T Recommendations and the International Telecommunications Regulations Final Acts both Parties shall summarize, in a balance of accounts for each month of the year, the amounts determined by the monthly accounts between the Parties and corresponding to the data presented in the monthly statements, and accepted by both Parties.

5.3. Both Parties shall issue an invoice on a monthly basis detailing the rounded amount of traffic minutes by destination, rates by destination and the total amount due.

5.4. Invoices relating to traffic minutes shall be sent by the Parties within thirty (30) calendar days from the end of the traffic month concerned, noting that this traffic shall be identified by the corresponding specific rate per destination given by the parties.

5.5. Invoices shall be paid within thirty (30) days of the issue date of the invoice.

5.6. If both Parties have invoiced each other within 30 days after the end of the relevant performance period, the mutual payment obligations referring to the traffic sent during the same performance period will be compensated, but any overdue amount has to be paid within the terms specified in article 5.5 hereinabove.

5.7. If either Party in good faith disputes any amount, it shall notify the other Party within sixty (60) calendar days following receipt of such disputed amount. The parties shall investigate the matter and do their best efforts to come to a mutual agreement. In addition, such dispute shall in no way affect the terms governing the management of accounts, settlement statements and payments: the desire of the Parties being to ensure proper uninterrupted continuance of their exchanges and payments, they expressly undertake to deduct no disputed amounts from outstanding payments. Disputed amounts are not subject of compensation.

5.8 Should agreement on the invoice query not be reached before the due date, payment should be made on all traffic volumes and destinations not in dispute. After the dispute has been resolved, the Party that issued an invoice will issue either a credit or a debit note against the invoice the dispute relates to. This note will be netted against the next payment.

5.9. In case of a failure to pay a substantial part of the undisputed Service charges due, the invoicing Party may suspend service to the other Party pursuant to article 12.6.

5.10. Failing payment of the undisputed amount in due time for any invoice, the creditor shall be fully entitled to charge the other Party interests equal to one and one-half percent (1.5%) per month compounded monthly, from the time such payment is due until the time payment is made in full, provided however that prior notice is given in the form of a final demand for payment.

5.11. The Parties have agreed that any Party may require from another Party to obtain issuance of a bank guarantee under condition that they insured their credit risk related to unpaid Invoices for Services provided by Parties to a level reasonably satisfactory to the other Party. In the event that the Party fails to obtain the issuance of bank guarantee within 10 (ten) working days from the receipt of such notice in written, the requiring bank guarantee Party will have the right to immediately terminate the Agreement.

6.   TRANSMISSION FACILITIES:

The telecommunications services between Albania and UNIFI as specified in this Agreement can be provided by using direct channels between Albania and UNIFI Global Network. .
The Parties will operate such number of international circuits between Albania and UNIFI as may be agreed between them from time to time to satisfy customers demand.
Each Party shall provide at its own cost the respective circuit portion of the international circuits and the necessary communications facilities for the implementation of the telecommunications services between Albania and UNIFI's Global Network within its operating territory. For the purposes of this Agreement, Operating Territory means Albania as regards to Albtelecom and as regards to UNIFI will mean UNIFI's Global Network.
Each of the Parties will provide technical interconnection of its international circuits with the national telecommunications network within its operating territory.
Each Party shall inform each other as soon as possible of failures or likely failures, which may occur within its communications facilities in their operating territory, in order to prevent protracted interruptions of the service between Albania. And UNIFI's Global Network.
Both Parties shall utilized an appropriate telecommunications system, capable of handling, transmitting and receiving international traffic. Neither of the Parties shall take any action, affecting in the other Party's ability to handle, transmit and receive the traffic of its customers within its operating territory.

## 7.  LOSS OF DATA

In the case of a partial or total loss of accounting data each Party may request accounting data for the relevant traffic from the other party. The other party sends this data electronically on a "reasonable effort" basis within 30 (thirty) days after the request. A shipping and handling fee may be charged from the requesting party

## 8.  STANDARDS & METHODS:

The technical standards and methods of operation applied by the Parties for the implementation of service as specified in this Agreement shall be agreed between the Parties from time to time and shall conform, unless otherwise agreed, to the Provisions of the in force ITU-T Recommendations.

## 9. LIABILITY:

Except for gross negligence and willful misconduct, the Parties shall in no case be liable to each other for any direct, indirect or consequential loss or damage due to any failure, degradation or interruption of services in the respective networks or in any other network or connection involved in communications services that are subject to this Agreement. The Parties expressly disclaim any kind of liability to third parties, arising from the performance of this Agreement

9.1      No Party shall be liable to the other Party, under the Agreement for any indirect, special, or consequential damages, including but not limited to, loss of use, loss of revenue, loss of profit, interest charges, cost of capital, or claims of its customers to which service is made, from any cause

## 10. AUTHORISATIONS & WARRANTIES

All agreements, understandings and performance of activities and obligations under this Agreement are contingent upon the obtaining and retaining all governmental authorization, approvals, licenses and consents as may be required or deemed necessary for this Agreement by the Parties.

### 10.1 Warranties

ALBTELECOM represents and warrants to UNIFI it is a corporation duly organized and existing under the laws of Albania having the power and authority to enter into this Agreement and perform its obligations hereunder, its signature hereto is duly authorized, it has taken all requisite corporate action to approve the execution and performance of this Agreement and this Agreement constitutes a valid and binding obligation upon it.

UNIFI represents and warrants to ALBTELECOM that it is a corporation duly organized and existing under the laws of New York State U.S.A, having the power and authority to enter into this Agreement and perform its obligations hereunder, its signature hereto is duly authorized, it has taken all requisite corporate action to approve the execution and performance of this Agreement and this Agreement constitutes a valid and binding obligation upon it.

Each Party hereby represents and warrants that it holds and shall continue to hold during the Term of this Agreement all necessary business licenses. consents and permissions as may be necessary to fulfil its obligations hereunder.

11. FORCE MAJEURE:

Neither Party shall be liable or accountable to the other for any failure, delay or service interruption due to cases or events, foreseeable or unforeseeable, reasonably beyond its control, including but not limited to acts of God, fire, floods or other catastrophic events, acts of Government or of any civil or military authority, national emergencies, insurrections, riots, war, strikes, lockouts, nor for any loss or damage arising there from. When such conditions apply, the affected Party shall notify the other Party hereof in writing as soon as possible.

12 .VALIDITY AND TERMINATION

12.1    This Agreement shall enter into force from the date of its execution by both Parties and shall continue thereafter, unless terminated by not less than 3 (three) months prior notice in writing given by either Party to the other.

12.2    Either Party may, upon written notice to the other, terminate and cancel this Agreement, with immediate effect and without any judicial intervention, in the event that the other Party voluntarily files a bankruptcy petition, and said petition is not disposed of within thirty (30) days, or if such Party shall make an assignment for the benefit of creditors or have a receiver appointed for it or its property or is otherwise insolvent.

12.3.    Either Party may, upon written notice to the other, terminate and cancel this Agreement without any judicial intervention in the event that any competent authority having jurisdiction over the Parties decides that the provision of the Services under this Agreement is contrary to existing laws, rules or regulations.

12.4.    Either Party may terminate and cancel this Agreement if the other Party voluntarily files a bankruptcy petition, and said petition is not disposed of within thirty (30) days, or if such Party shall make an assignment for the benefit of creditors or have a receiver appointed for it or its property or is otherwise insolvent.

12.5.    Except to the extent otherwise provided for herein, either Party may, without prejudice to its other rights, decide to terminate this Agreement forthwith upon notifying the other Party, to that effect in writing, in the event that the other Party is in material breach of the conditions set out in this Agreement, and such default, if capable to be cured, is not remedied within 30 days from such notification.

12.6.    "The termination of the contract in any case shall survive over the obligation of each        party to fulfill its obligation towards the other party according this contract, even if the date for such fulfillment will be after the date of termination"

12.7 Either Party shall be entitled to suspend the provision of part or all of the Service:

a.) if the other Party fails to pay a substantial part of the undisputed Service charges due and fails to remedy such failure within (14) fourteen days of receipt of a written notice by registered mail specifying the non-performance and requiring its rectification;

b.) in order to secure the serviceability of the telecommunications network after the careful consideration of circumstances, effects and consequences. The other Party shall be informed immediately thereof or in advance, if possible.

The suspension shall be lifted once the ground-giving rise to the suspension has been remedied. Where the cause of suspension as to a.) And b.) Is one Party's gross negligence or wilful intent, the costs for barring and reconnecting shall be paid by the Party guilty of gross negligence or wilful intent.

13. CONFIDENTIALITY:

All information contained in this Agreement (which are not in the public domain) should be treated as commercially sensitive. They are exchanged in good faith and should, under no circumstance, be given to any third party without prior written consent from the other Party, particularly to any third Party offering competitive service in either Albania or via UNIFI Global Network. Each Party hereto will hold in strict confidence all information related to this Agreement and its Appendices, except any such information that:
- was or becomes generally available to the public;
- was or becomes available to such Party from a third party on a non confidential basis;
- was or becomes independently developed by a Party without reference of information; or
- was known to such Party prior to the date of execution of this Agreement.
Exception to the above shall be made in the event that the information is required to be disclosed pursuant to any applicable law, rule or regulation issued by any regulatory Authority or governmental Entity or Agency having jurisdiction over the Parties. In such event the Parties agree to inform each other of the disclosure of information as soon as practicable.
Confidentiality obligations shall survive for a period of 3 years after termination of this Agreement.

14. REPRESENTATION&NETWORKS OF TIRD PARTIES
The Parties represent that with respect to the subject matter hereof this Agreement constitutes the sole and exclusive understanding of the Parties and supersedes all prior agreements, arrangements or understandings (both written and oral) relating to the subject matter.
14.1    Networks of third Parties
UNIFI and ALBTELECOM will Endeavour to maintain all existing agreements with major operators or will enter into new agreements with operators in their respective country to provide a countrywide coverage for PSTN/ISDN and mobile termination as long as it is commercially reasonable.

15. WAIVER:
The failure of one Party to insist upon the strict adherence to any term of the Agreement on any occasion shall not be considered as a waiver of any right there under nor shall it deprive that Party of the right to insist upon strict adherence to that term or any other term of the Agreement at some other time.

16. AMENDMENTS:
No amendments, revision, changes or discharges of this Agreement in whole or in part shall have any force or effect unless set forth in writing and signed by authorized representatives of both Parties.

17. RELATIONSHIP:
The relationship between the Parties in relation to this Agreement is that of independent contractors, as telecommunications carriers, jointly providing communications services. Nothing in this Agreement shall be considered as to constitute a partnership or joint venture agreement between the Parties.

18. ASSIGNMENT:

Except to a legal successor, neither Party shall wholly or partially transfer or assign or pledge any of its rights or obligations hereunder without the prior written consent of the other Party.

provided however that either Party may assign its rights and obligations under this Agreement to its affiliates, to its parent Company or affiliates of the parent Company upon due information to the other Party. Thus the former Party shall be deemed as released from the duties and obligations concerning this Agreement with the exception of questions pending and being raised before the assignments of rights

## 19. EXCLUSIVITY

Nothing in this Agreement shall be deemed as a restriction or prohibition for either of the Parties to enter into similar agreements with a third party.

## 20. SEVERABILITY &PARTIAL IVALIDITY

If any portion of this Agreement is found invalid or unenforceable, such portion shall be void and of no effect while the remaining part of the Agreement shall continue in full force and effect unless the Agreement fails of its essential purpose as a consequence of the elimination of the voided portion. If any Party reasonably deems the Agreement to fail of its essential purpose with the elimination of the voided portion, the Parties shall promptly negotiate a replacement provision in good faith.

## 20.1. Partial Invalidity

If at any time any provision, or part thereof, of this Agreement is or becomes illegal, invalid or unenforceable, that shall not affect or impair the legality, validity or enforceability of the remainder of such a provision or any other provisions under this Agreement. Ineffective or unenforceable provisions shall, by mutual agreement, be replaced by effective and enforceable provisions which shall come as close as possible to the technical and economic contents of the ineffective or unenforceable provision.

The same shall apply if individual provisions of this Agreement are held ineffective or unenforceable, whether in whole or in part, by an official authority whose decision cannot be appealed, in which case the contracting parties shall replace the provision by mutual agreement within a reasonable period of time, unless such period is determined in more detail by the unappeleable decision, order or statute.

## 21. GOVERNING LAW AND DISPUTES:

21.1 This Agreement shall be governed by the laws of Switzerland.

21.2 The Parties shall attempt in good faith negotiations to adjust and dispose of any disagreement or dispute, which may arise between them regarding the interpretation, the performance of, or the failure to perform under this Agreement.  Should an agreement not be reached between the Parties, the dispute shall be finally settled by arbitration according to the Rules of Conciliation and Arbitration of the International Chamber of Commerce (ICC) by one or more arbitrators appointed in accordance with the said Rules.  The arbitration shall be held in Zurich (Switzerland) and shall be conducted in English language.

## 22 NOTICES:

All official documents of correspondence including notices required by this Agreement that are to be given by either Party to the other Party shall be in English, unless specifically agreed upon, and shall be forwarded by hand delivery or sent by post (airmail where possible) postage paid or by

8

telex or telefax and shall be addressed to the last known address of the other Party and shall be confirmed by letter if so required. The addresses to which communications shall be sent are:

| NOTICE CONTACT POINT | |
|---|---|
| By Mail: UNIFI Communications ,Inc<br><br>245 Park Avenue 24th Floor<br>New York NY 10167 U.S.A<br>Tel:+1-212-731-2024<br>Fax:+1-212-504-8299<br>mailto:legal@unificom.com | By Mail: Albtelecom sh.a<br><br>Rr. Myslym Shyri, 42<br>Tirana, Albania<br>By Fax: +355 4 253535<br>By e-mail:<br><br>In all cases marked:  "For the attention of " |

23.    ENTIRE AGREEMENT: This Agreement includes the following Appendices, which are attached hereto and incorporated herein by reference:
Appendix 1A  International Telephone service
Appendix 1B  ISDN service
Appendix 1C  Virtual Transit service
Appendix 2    Bank Instructions, Telecommunications Accounts
Any inconsistencies between the documents forming this Agreement shall be resolved by giving them the following order of precedence, unless expressly stated to the contrary:
Appendices
Main body of this Agreement

IN WITNESS WHEREOF, the Parties have executed this Agreement in duplicate by their duly authorized representatives.

UNIFI

Name: Adrian Shatku

Title:  President/CEO

Signature

Date: 08/02/2006

ALBTELECOM

Name: Ilirian Kuka

Title:  General Director

Signature

Date:

Appendix 1A

INTERNATIONAL TELECOMMUNICATIONS SERVICE AGREEMENT
BETWEEN

ALBTELECOM sh.a.
AND
UNIFI

International Telephone Service

Appendix 1A is attached to and incorporated into the International Telecommunications Service
Agreement made between Albtelecom.and UNIFI

1. International Route and Service Provision

The international route for the service shall be agreed from time to time between the Parties.

The international telephone service between UNIFI and Albania shall be commenced using ISDN
E1 direct circuits.

The number of direct circuits used for international telephone service may be changed according to
mutual agreement between the Parties.

2. Accounting Rates, Divisions and methods of Settlement

Procedures for establishment and settlement of direct international accounting shall be in line with
appropriate ITU Regulations except where the Parties have agreed otherwise in this Agreement.

The Total Accounting Rate and divisions applicable to the telephone service and expressed in SDR
between UNIFI and Albania are since August,02, 2006 as appendix 1/D:

2.1. Each party shall produce a monthly traffic account for its outgoing traffic and shall send the
account to the other party. The monthly account shall provide the following information:
- Monthly traffic
- Traffic for the preceding period, if it was not indicated therefore.
- Routing
- Class of services
- Number of call and paid minutes
- Share of the accounting rate in SRD
- Amount due (to the corresponding carrier)

The accounting rates can be reviewed and changed by mutual agreement between the Parties.
Personal call surcharge shall be excluded from international accounting.

3. Choice of the Currency of Payment Concerning Balance of Accounts between

ALBTELECOM and UNIFI

UNIFI                      is the creditor - USD
If ALBTELECOM              is the creditor - USD

4. Mailing Address for Monthly Accounts and Statements of Accounts

|  | UNIFI | For ALBTELECOM |
|---|---|---|
| Name | Sarah Scary | Ergys Demneri |
| Function | Billing Analyst | Head of Department |
| Department | Billing Settlements | International          Accounting Department |
| Telephone | +1-212-731-2024 | + 355 4 242172 |
| Fax | +1-212-504-8299 | + 355 4 253467 |
| E-mail: | billing@unifiicom.com | egys.demneri@albtelecom.al |

5. Bank Instructions
See Appendix 2.

6. Duty Hours
International telephone service between Albania shall be provided on a 24 hour 7 days a week basis without interruptions.

7. Exchange of information
To ensure effective implementation and operation of the service the Parties have to exchange:
    a) Appropriate sales and service implementation plans on an ongoing basis,
    b) Information on their respective collection rates and customer pricing as appropriate,
    c) Details of the numbering scheme employed to access their public switched voice customers in the operating territory (ITU Recommendation E. 149), and
    d) Details of the service positions/facilities and how they may be accessed by the other Party's service positions.

8. Amendments
Alterations or improvements of this Appendix and his Addenda may be subject to negotiations at any time and enter into force as agreed between the Parties independently of the Agreement.

UNIFI                                          ALBTELECOM

Name: Adrian Shatku                            Name: Ilirian Kuka

Title:  President/CEO                           Title:  General Director
Signature                                       Signature

Date : 2006-08-02                               Date: 2006-08-02

Appendix 1B

INTERNATIONAL TELECOMMUNICATIONS SERVICE AGREEMENT
BETWEEN
ALBTELECOM sh.a.
ISDN SERVICE
AND
UNIFI

Appendix 1B is attached to and incorporated into the International Telecommunications Service Agreement made between Albtelecom and UNIFI

1. Description of Service
The service offered pursuant to this Appendix is ISDN service, which enables to support a wide range of audio, video and data applications in the same network.

2. Connection Date
ISDN service will be introduced next day after the tests are successfully made between the Parties. ISDN traffic will be reported separately under entry "ISDN" for fix traffic and "ISDM" for mobile traffic 64K unrestricted, on the invoices.

3. Services
The following services will be supported:
3.1 Bearer services

3.2 Telecom service
- Telephony
- Telefax (group 2/3)
- Telefax (group 4)
Video telephony
Video conference
3.3 Supplementary services
- Sub addressing                        (SUB)
- Terminal portability                  (TP)
- User-to-user signaling 1st level      (UUS-1)

The services provided under this Appendix 1.1 shall be both way services. Measurement to traffic will be carried out on each B-channel. Implementation of any additional services will require an amendment of this Appendix.

4. Accounting Rates and Settlements
4.1 The same Accounting Rates will be applied for ISDN or ISDM or Video call service between the Parties as settled in Item 2 of Appendix 1A.
4.2 ISDN traffic will be reported separately under entry ISDN or ISDM or Video call on the invoices.

5. Exchange of information
5.1 To ensure effective ISDN marketing, the Parties shall exchange information as mutually agreed by the Parties on developments in the ISDN markets in their respective country/region including information on:

- Market developments
- Tariffs
- Current services and characteristics of the national PSTN network
- Planned services and their characteristics

5.2 If either Party needs to modify the network configuration to accommodate an expansion of the ISDN range, it shall inform the other Party minimum sixty (60) calendar days in advance.
Measures to be taken as a result of new or changed offers shall be discussed by the Parties' technical experts.

## 6. Duration

This Appendix shall come into force on the date of signature and shall continue thereafter unless and until terminated by not less than three (3) months' prior written notice. Alterations or improvements of this Appendix may be subject to negotiations at any time and enter into force as agreed between the Parties independently of the main Agreement.

If the International Telecommunications Service Agreement is terminated then this Appendix shall also be terminated at the same date.

UNIFI

Name: Adrian Shatku

Title:  President/CEO

Signature

Date : 2006-08-02

ALBTELECOM

Name: Ilirian Kuka

Title:  General Director

Signature

Date:2006-08-02

Appendix 1C

INTERNATIONAL TELECOMMUNICATIONS SERVICE AGREEMENT
BETWEEN
ALBTELECOM sh.a.
VIRTUAL TRANSIT SERVICE

AND
UNIFI

Appendix 1C is attached to and incorporated into the International Telecommunications Service Agreement made between Albtelecom and UNIFI

1. Introduction
On a non-exclusive basis, each Party agrees to provide the other Party with Virtual Transit Service (hereinafter the "Service") termination, allowing the other Party to route portions of its international outbound telecommunications voice traffic destined to various destinations. This Agreement specifically excludes any warranty or representations of exclusivity of connecting facilities by one Party to the other.
The type of traffic covered by this Agreement shall be international direct dial (IDD) voice traffic sent by each

Party to the other, and excludes calls connected by the operator.
This Agreement supersedes all prior verbal or written understandings between the Parties and constitutes the entire agreement with respect to the subject matter of this Agreement. The following Schedules shall be included and form an integral part of this Agreement:
-Schedule 1:   Operational specifications - Transit implementation form
-Schedule 2:   Duration and Delivery Rates
-Schedule 3:   Contact Points

2. OBLIGATIONS OF THE PARTIES
    2.1   Each Party shall be responsible for the provision and maintenance of and payment for the necessary interconnection facilities in respect of its portion of the Service hereunder, located within its operating territory, respectively UNIFI for what concerns his Global Network, and Albania, for what concerns ALBTELECOM.
The technical standards and methods of operation to be used by the Parties in the provision of the Service hereunder shall be agreed upon by the Parties and specified in Schedule 2.

    2.2   Each Party may refuse to carry traffic to any specific destination(s) on a temporary or emergency basis if technical service issues, such as route failures, arise which make the carriage of that traffic technically impossible. In the event such conditions occur, the receiving Party shall exercise every reasonable means within its control to repair said condition or to implement alternate routes for said traffic as soon as reasonably possible. In the event the above, or any other, temporary or emergency conditions arise, and as soon as it has been identified by a Party, the Party will notify the other Party according to the escalation list provided in Schedule 3 hereto.

## 3. FORECASTS AND INVESTMENTS

3.1.   Both Parties agree to exchange traffic forecasts every three (3) months to ensure adequate dimensioning of the network facilities between them.

The Parties shall use all reasonable means not to exceed the agreed maximum volumes of IDD traffic (minutes per month), as specified per destination and as set out in Schedule 3, in order to guarantee an even distribution over the respective month.

## 4. RATES

4.1   UNIFI and ALBTELECOM shall carry out payments to each other on a rate per minute basis for all IDD traffic reciprocally routed and specified in Schedule 3.

4.2.   Either Party may alter the rates detailed in Schedule 3 provided that the other Party is given at least seven (7) working days written notice. In those cases where either Party wishes to increase rates already agreed, the sending Party shall have the right, within the seven (7) working days notification period, to re-route the respective traffic to another carrier. If the transiting Party fails to reply within the notification period, both Parties hereby agree to grant tacit consent to the sending Party. The new prices will be considered to form an integral part of this Agreement and its Schedule thereby, automatically superseding any previous prices. Decreases can be issued upon notice.

4.3.   All access rates shall be quoted in USD and are exclusive of taxes.

## 5. BILLING

Billing will be based on actual call duration as measured by the parties.

UNIFI shall bill each ALBTELECOM originating call in one-second increments.

As an exception of Point 5.2, and only for the following destinations: UNIFI shall bill each Albtelecom originating calls for termination and break out to such destinations with a one (1) minute minimum with rounding up to next full minute application.

ALBTELECOM shall bill UNIFI for Incoming calls in one-second increments.

## 6. INVOICING & PAYMENT

6.1.   Both Parties shall produce one invoice per month detailing the rounded amount of traffic minutes by destination, rates by destination and the total amount due.

6.2.   Invoices relating to traffic minutes shall be sent by the Parties within thirty (30) days following the end of the month to which the invoice relates. However the parties have the opportunity to insert the traffic going back up to fifteen (15) months in respect of the actual account or invoice. Invoice currency shall be in USD.

6.3   Payment currency shall be in USD

No credit allowance shall be made in the account for uncollected amounts. Each Party shall be responsible for its own un-collectable.

Settlement balance of all due invoices under this Agreement shall be made between the Parties on a monthly basis. The terms of payment for the monthly debtor Party shall be sixty (60) days from invoice date (the Due Date).

Neither Party shall have any further right of setoff, credit nor other reduction, except as expressly permitted by this Agreement.

Invoices rendered under this Agreement not paid when due, shall accrue interest from the date the payment was due until the date the payment was made at 2% above the applicable USD rate, or any

other interest rate permitted by the law, whichever is less, with value date of two business days before the date the delayed payment was made.

The amount of default interest will be included in a subsequent bill/or bills to the Customer, payable with the same terms and conditions related to the invoices issued as per this Clause 6.

6.4    The invoices shall not be amended.

The Parties shall settle any amounts agreed to with the next payment. Credit notes shall be issued for undue billed amounts.

Any invoice queries should be presented to invoicing Party in reasonable detail in writing within thirty (30) days of the date of the invoice. If the disputed amount is less than 1% of the entire invoice, the complete amount should be paid and then disputed.

6.5. Complaints invoicing

If any Party disagrees with an invoice received from the other Party, it must notify in writing the other Party thereof before the due date of such invoice.

All invoices and protests must at least explicitly mention the Agreement's reference number, the invoice number, the invoice date, the invoice period, the Carrier Service supplied, the telecommunications route (if applicable), the object and arguments of protest (if applicable).

After the dispute has been solved, the Party that issued an invoice will issue either a credit or a debit note or an adjustment inserted in a future invoice against the invoice the dispute relates to. This note will be netted against the next payment.

An invoice shall be deemed to have been accepted by the debtor Party if the debtor Party does not present a written objection before the Due Date.

Should an agreement on the invoice query not be reached, payment should be made on all traffic volumes and/or destinations not in dispute.

If the Parties fail to resolve the dispute within thirty (30) days after the relevant amount has been contested, the Parties shall proceed according to Article 16 herein.

6.6 .Late Payments

If the parties have settled their dispute and payment is not received by the invoicing Party within ten (10) days of the dispute settlement, the invoicing Party may, temporarily suspend service to the defaulting Party until such time as payment is received in full prior a ten (10) days written notice to the defaulting Party.

In case of non-payment for not disputed amounts, the invoicing Party may temporarily suspend service to the other Party until such time as payment is received in full. Prior to suspension of services the invoicing Party will provide written notice to the default Party.

The Party exercising its right to suspend hereunder shall not be liable for any loss, damage or inconvenience suffered by the other Party.

7. NOTICES

Any communications by either Party to the other shall, unless otherwise provided herein, be sufficiently made if sent by post (by air mail where possible), postage paid, or by telegraph, telex or telefax transmission to the address hereinafter specified and shall, unless otherwise provided herein, be deemed to have been made to the other Party on the day on which such communications ought to have been delivered in due course of postal, telegraphic, telex or telefax transmission. Unless otherwise specified, by a not less than 15 days' prior written notice, by the affected Party, the communications shall be sent to:

| NOTICE CONTACT POINT | |
|---|---|
| By Mail: UNIFI Communications, Inc<br>Billing Department<br>245 Park Avenue 24th Floor<br>New York NY 10167<br>By Fax:  +1-212-504-8299<br>By Tel:  +1-212-731-2024<br>mailto:billing@unificom.com | By Mail:  Albtelecom sh.a<br><br>Rr. Myslym Shyri, 42<br>Tirana, Albania<br>By Fax: +355 4 253535<br>By  e-mail:<br>Ergys.demneri@albtelecom.al<br>In all cases marked:  "For the attention of<br>" Ergys Demneri |

UNIFI

Name: Adrian Shatku

Title:  President/CEO

Signature

Date : 2006-08-02

ALBTELECOM

Name: Ilirian Kuka

Title:   General Director

Signature

Date: 2006-08-02

17

Appendix 2

INTERNATIONAL TELECOMMUNICATIONS SERVICE AGREEMENT
BETWEEN

ALBTELECOM

AND

UNIFI

Bank Instructions. Telecommunications Accounts.

| UNIFI | ALBTELECOM |
|---|---|
| 245 Park Avenue 24th Floor | Rruga " Myslym Shyri", no.42 |
| New York NY 10167 | TIRANA |
| USA | Albania |
| JP Morgan Chase | Bank |
| Account: 746501466365 | Swift Code: |
| ABA Routing: 021000021 | Account No: |
| Swift Code: CHASUS33 | |
| | |
| Bank Address: 260 Columbus Avenue | Bank Address: |
| New York NY 10023 | Zip code          City |
| U.S.A | Country |

SCHEDULE 1

Operational Specifications – Transit implementation form

The following items have been agreed between the Parties:

- Both Parties agreed to send traffic to each other.

- Both Parties agreed to establish for virtual traffic service all the existing bilateral circuits, with necessary capacity for each service:
Standard Quality          service up to 32 E1 ISDN circuits
High Quality               service up to 32 E1 ISDN circuits
ISDN (for transit data services) as for High quality

- Signaling: ISDN

- RFS Date: 2006-08-02


Date: 2006-08-02                                        Date: 2006-08-02


SCHEDULE 2

Duration & Delivery Rates

1.     Initial term of this Agreement:  1 years

2.     Rates Currency:      SDR

3.     Currency of payment:  USD


ALBTELECOM Rates to UNIFI:
Fixed
Mobile

The reference price list for VTS service and for ISDN (it means: ISDN and ISDM, 64K unrestricted) will be agreed by the parties and exchanged by e-mail and fax

UNIFI Rates to ALBTELECOM:

The reference price list for VTS service and for ISDN (it means: ISDN and ISDM, 64K unrestricted) will be agreed by the parties and exchanged by e-mail and fax

Date: 2006-08-02                                        Date: 2006-08-02

SCHEDULE 3

Contact points

|  | ALBTELECOM | UNIFI |
|---|---|---|
| **1. Commercial** | | |
| Name | Ergys Demneri | Zeko Abas |
| Function | Head of Department | Carrier Director |
| Department | International Accounting Department | Carrier Sales |
| Telephone | + 355 4 242172 | +1-212-731-2024 |
| Gsm | n/a | +1-917-403-8299 |
| Fax | + 355 4 253467 | +1-212-504-8299 |
| E-mail | ergys.demneri@albtelecom.al | zabas@unificom.com |

**2. Technical**
**2.A. Switching, Signaling and Traffic**
*2.A.1. From 6 AM to 5 PM. GMT – Working days*

|  | | |
|---|---|---|
| Name | Ened Kerçini | Roman Faynberg |
| Department | Technical Department | Routing Dept |
| Function | Head of Department | Senior Routing Specialist |
| Telephone | + 355 4 235 233 | +1-212-897-3025 |
| Fax | + 355 4 232 200 | +1-212-504-8299 |
| E-mail | ened.kercini@albtelecom.al | roman@unificom.com |

*2.A.2 Outside A.1 hours : see* 2.B. Transmission
**2.B. Transmission - (24h/24h - 7 Days/Week)**

|  | | |
|---|---|---|
| Name | | Zaur MIkhaylov |
| Department | | NOC |
| Function | | Network monitoring center |
| Telephone | | +1-212-897-3025 24 hours |
| Fax | | +1-212-504-8299 |
| GSM | | noc@unificom.com |

**3. Financial**

|  | | |
|---|---|---|
| Name | Myrvete Ferhati | Frank Arlia |
| Function | Head of Department | Billing Settlements Director |
| Department | Financial Department | Billing |
| Telephone | | +1-212-731-2024 |
| Fax | | +1-212-504-8299 |
| E-mail | | billing@unificom.com |
| Name | | Cynthia Beuconant |
| Title | | Billing Analyst |
| Department | | +1-212-731-2024 |
| Telephone | | +1-212-504-8299 |
| Fax | | billing@unificom.com |
| E-mail | | |