# Exhibit 2

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 18796/GZ/MHM

ALBTELECOM SH.A

(Albania)

**vs/**

UNIFI COMMUNICATIONS, INC

(U.S.A)

This document is an original of the Award by Consent rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

ICC Case No. 18796/GZ/MHM

Award by Consent

## TABLE OF CONTENTS

1 THE PARTIES ............................................................. 3

2 SOLE ARBITRATOR ........................................................ 4

3 PROCEDURAL HISTORY .................................................... 4

4 THE ARBITRATION AGREEMENT .................................... 20

5 RULES OF LAW APPLICABLE TO THE MERITS OF THE DISPUTE............................................................ 20

6 BACKGROUND OF THE DISPUTE ................................... 21

7 THE PARTIES' POSITIONS AND RELIEF SOUGHT IN THE ARBITRATION............................................................ 22

   7.1   The Claimant's Position and Relief Sought ............................22

   7.2   The Respondent's Position and Relief Sought ........................22

8 THE PARTIES' SETTLEMENT ........................................... 24

9 COMMUNICATIONS AFTER THE SETTLEMENT AGREEMENT................................................................. 35

10 CONSIDERATIONS OF THE SOLE ARBITRATOR ............ 37

11 COSTS.............................................................................. 38

12 DISPOSITIVE PART........................................................... 38

# INTERNATIONAL COURT OF ARBITRATION
# INTERNATIONAL CHAMBER OF COMMERCE
## ICC CASE NO. 18796/GZ/MHM

## AWARD BY CONSENT

(pursuant to Article 32 ICC Rules in force as of 1 January 2012)

in the arbitration

## ALBTELECOM SH.A (ALBANIA)

Claimant

### VS.

## UNIFI COMMUNICATIONS, INC (U.S.A.)

Respondent

**Before:**

Joachim Knoll
(Sole Arbitrator)

## 1    THE PARTIES

1    The Claimant is ALBTELECOM SH.A (Albania), a company organized under the laws of Albania, with its registered office at Autostrada Tirane – Durres, km 7, Kashar, Tirana, Albania ("**ALBTELECOM**" or the "**Claimant**"), assisted and represented in this arbitration by:

Mr Mathis Kern / Mr Christopher Bollen
BYRNE-SUTTON BOLLEN KERN
3 rue de l'Hôtel-de-Ville
1204 Genève, Switzerland
Telephone :+41 22 318 5636
E-mail:     cb@advise.ch / mk@advise.ch

Ms Flonia Tashko Boriçi
TASHKO PUSTINA-ATTORNEYS
Rr. Deshmoret 4 Shkurtit
No. 5, Sky Tower, 13/4
1000 Tirana, Albania
Telephone: +355 4 238 9190
E-mail:     Flonia.tashko@tashkopustina.com

2    The Respondent is UNIFI COMMUNICATIONS, INC ("**Unifi**" or the "**Respondent**") a company organized under the laws of the State of New York, which operates a public telecommunications network providing international telecommunications services. The Respondent has its registered office at 60 Broad Street, 38th Floor, New York, NY 10004 and is assisted and represented in this arbitration by:

Mr Joseph P. Goldberg / Ms Jacquelyn Trussel
HODGSON RUSS LLP
1540 Broadway, 24th floor
New York City, 10036, U.S.A.
Telephone: +1 212 751 4300
E-mail:     jgoldberg@hodgsonruss.com /
            jtrussell@hidgsonruss.com

Mr Daniel Hochstrasser / Ms Simone Stebler
BÄR & KARRER AG
Brandschenkestrasse 90
CH-8027 Zurich, Switzerland
Telephone :+41(0) 58 261 50 00
E-mail:       daniel.hochstrasser@baerkarrer.ch
              simone.stebler@baerkarrer.ch

3   The Claimant and the Respondent are hereinafter jointly referred to as the
    "**Parties**".

## 2   SOLE ARBITRATOR

4   The Arbitral Tribunal consists of the following Sole Arbitrator:

Mr Joachim Knoll
LALIVE
35 rue de la Mairie
CH-1207 Geneva, Switzerland
Telephone: +41.22.319.87.00
E-mail: jknoll@lalive.ch

hereinafter referred to as the "**Sole Arbitrator**".

5   The Sole Arbitrator was appointed by the ICC International Court of
    Arbitration (the "**ICC Court**") on 10 January 2013, pursuant to
    Article 13(1) of the ICC Rules of Arbitration in force as from 1 January
    2012 (the "**ICC Rules**").

## 3   PROCEDURAL HISTORY

6   These arbitral proceedings were initiated by the Claimant's Request for
    Arbitration, filed on 29 June 2012 and received by the Secretariat of the
    ICC Court (the "**Secretariat**") on the same day (the "**Request**"). In its
    Request, the Claimant announced that it would seek from the arbitral
    tribunal to be constituted, *inter alia*, an order for the Respondent to pay
    to the Claimant the amount of USD 4'609'689 "*for the unpaid portion of
    the services rendered by Claimant*" under the contract at issue in this
    arbitration, namely the Agreement on International Telecommunication

ICC Case No. 18796/GZ/MHM

Award by Consent

Services entered into between the Parties on 2/8 August 2006 (the "**Interconnection Agreement**"). The Claimant further suggested that the dispute be decided by one arbitrator.

7    In a letter to the Parties dated 2 July 2012, the Secretariat acknowledged receipt of the Request and invited the Claimant to pay a filing fee of USD 3'000.

8    In a letter dated 11 July 2012, the Secretariat acknowledged receipt of the filing fee and advised the Claimant that the Secretary General of the ICC Court had fixed the provisional advance to cover the costs of the arbitration until the Terms of Reference are established at USD 45'000 (receipt of which was acknowledged by the Secretariat on 10 August 2012).

9    In a letter to the Respondent of the same date, the Secretariat notified the Respondent of the Request and invited the Respondent to file its Answer to the Request, pursuant to Article 5 ICC Rules, within thirty days.

10    In a letter dated 10 August 2012, the Respondent requested an extension until 14 September 2012 of the time limit for filing its Answer to the Request for Arbitration. The Respondent further requested that the matter be heard by three arbitrators.

11    In a letter dated 14 August 2012, the Secretariat granted the Parties until 23 August 2012 to either agree on a Sole Arbitrator or to request to have three arbitrators, failing which the ICC Court would determine the number of arbitrators, pursuant to Article 12(2) ICC Rules.

12    In a letter dated 23 August 2012, the Respondent advised the Secretariat that the Parties had agreed to select an arbitrator from a list submitted to the Parties by the ICC Court. After further correspondence between the Parties and the Secretariat on the exact methodology to be applied in this respect, the Secretariat provided a list of seven arbitrators to the Parties, in a letter dated 16 October 2012.

13    In the meantime, the Respondent had filed its "Answer and Affirmative Defenses" on 14 September 2012 (the "**Answer**"). As part of its Answer, the Respondent further asked the Secretariat not to forward the Request to the arbitrator unless and until paragraphs 7, 8, 10, and 12 are stricken

5

and removed from the Request, as "[t]*hese paragraphs impermissibly and improperly reference confidential settlement negotiations*". The Claimant replied in a letter dated 21 September 2012 that the ICC Court did not have the power or jurisdiction to order the requested measure, and asserted that the request was, in any event, unfounded. The Respondent reiterated its request in a letter dated 25 September 2012. In a letter of the same date, the Secretariat invited the Parties to address the issue with the Sole Arbitrator, once appointed or confirmed by the ICC Court. The Secretariat reiterated the same position in a letter dated 23 October 2012, drawing the Parties' attention to Article 22(3) ICC Rules.

14   Following their agreement, the Parties ranked the arbitrators suggested by the ICC Court on 16 October 2012, leaving two candidates with the highest combined ranking. The Parties were not able to agree on one of these two candidates as the Sole Arbitrator and therefore asked the ICC Court, in letters dated 21 December 2012, to appoint either of the two remaining candidates as the Sole Arbitrator.

15   In the meantime, in a letter dated 29 November 2012, the Secretariat advised the Parties that the ICC Court had, as its session of 29 November 2012, fixed the advance on costs at USD 150'000, subject to later readjustments (Article 36(2) ICC Rules). Accordingly, once the file had been transmitted to the Sole Arbitrator, in a letter dated 11 January 2013, the Secretariat invited the Claimant to pay an amount of USD 30'000 (USD 75'000 less USD 45'000 already paid), and the Respondent to pay an amount of USD 75'000. The Secretariat reiterated its request in a letter dated 22 February 2013, when neither Party had made the requested payment. The Claimant subsequently made the payment of USD 30'000, receipt of which was acknowledged by the Secretariat on 26 February 2013. The Secretariat again reminded the Respondent of its obligation to pay its share of the advance on costs, in a letter dated 18 March 2013 and in subsequent letters. No payment was made by the Respondent.

16   In a letter dated 11 January 2013, the Secretariat informed the Parties that, at its session of 10 January 2013, the ICC Court had appointed Mr Joachim Knoll as Sole Arbitrator. The Secretariat transmitted the file to the Sole Arbitrator under cover of a separate letter of the same day.

17    The Sole Arbitrator introduced himself to the Parties and opened the proceedings in a letter dated 14 January 2013.

18    In a telephone conference on 8 February 2013, the Parties and the Sole Arbitrator discussed the specific procedural rules to be applied and the organization of the proceedings, as well as the Respondent's application to strike parts of the Request from the record.

19    On this basis, the Sole Arbitrator prepared draft versions of the Terms of Reference and Procedural Order No. 2 ("**PO 2**"), including a provisional timetable for the arbitral proceedings, a copy of which was provided to the Parties on 11 February 2013. In the same letter, following the Respondent's request, the Sole Arbitrator decided, by way of Procedural Order No. 1, to strike parts of paragraph 10 of the Request from the record and invited the Claimant to file a revised Request. The Claimant did so in an e-mail dated 22 February 2013.

20    The Parties and the Sole Arbitrator discussed the draft Terms of Reference and PO 2 during a further conference call on 27 February 2013. After further comments were made by the Parties in subsequent correspondence, the Sole Arbitrator finalized the Terms of Reference and PO 2. PO 2, which contained the agreed specific procedural rules to be followed in this arbitration, as well as the provisional timetable for the proceedings, was issued to the Parties on 18 March 2013. The Sole Arbitration signed the Terms of Reference on the same day, after Counsel for both Parties had signed them (at its session of 7 March 2013, the ICC Court extended the time limit for establishing the Terms of Reference until 31 May 2013, pursuant to Article 23(2) ICC Rules).

21    At its session of 28 March 2013, the ICC Court fixed 31 August 2014 as the time limit for the final award, based upon the procedural timetable (Article 30(1) ICC Rules).

22    The Claimant filed its Full Statement of Claim on 26 April 2013 (the "**Statement of Claim**" or "**SoC**"), including an Expert Report by Mr Oscar Gonzalez Soto dated 22 April 2013. On 8 May 2013, the Claimant filed a revised version of this expert report, dated 3 May 2013. The Respondent confirmed in an e-mail of 9 May 2013 that it did not object to this filing.

7

23    In the absence of payment on the Respondent's part of its share of the advance on costs, the Secretariat, in a letter dated 16 May 2013, invited the Claimant to substitute for the Respondent by paying the amount of USD 75'000. In a letter dated 30 May 2013, the Claimant requested that the Secretariat suspend the time limit for paying the amount in question, that it fix separate advances on costs for the Claimant's claims and the Respondent's counterclaims, and that it take into account the Respondent's set-off claim in fixing such separate advances.

24    In a letter dated 14 June 2013, the Respondent advised the Sole Arbitrator that it was no longer going to pursue its counterclaim. The Respondent re-confirmed this in a letter dated 27 June 2013, but reserved *"all rights with respect to any applicable defences and/or set-offs"*.

25    In a letter dated 4 July 2013, the Secretariat advised the Parties that it understood that the Respondent had withdrawn its counterclaims and that, accordingly, the Claimant's request for separate advances on costs had become moot. Accordingly, the Secretariat confirmed a request made in a letter two days earlier, on 2 July 2013, for the Claimant to make the requested payment of USD 75'000 by 22 July 2013, failure of which might lead the Secretary General of the ICC Court to invite the Sole Arbitrator to suspend his work and set a time limit of not less than 15 days on the expiry of which the claims would be considered withdrawn (Article 36(6) ICC Rules).

26    In a letter dated 19 July 2013, the Claimant reiterated its request that the Secretariat fix separate advance on costs, arguing that while the Respondent had formally withdrawn its counterclaims, it was going to uphold its set-off claims, which required the Sole Arbitrator to consider *"additional matters"* within the meaning of Article 36(7) ICC Rules.

27    In a letter dated 23 July 2013, the Secretariat suspended the Claimant's payment obligations until further notice.

28    The Respondent filed its Full Statement of Defence on 24 July 2013 (the **"Statement of Defence"** or **"SoD"**).

29    In a letter dated 31 July 2013, the Secretariat referred to the set-off claim in the Respondent's Statement of Defence and informed the Parties that,

if not advised otherwise, the ICC Court would examine whether to readjust the advance on costs based on the new amount in dispute (including the set-off claims) and to fix separate advances on costs.

30   In subsequent correspondence dated 5 and 6 August 2013, the Respondent requested that the ICC Court not fix separate advance on costs, given that the set-off claims arose from the identical facts and circumstances addressed in the Claimant's claim and did not raise issues separate and apart from those raised in the Claimant's claim. In turn, the Claimant reiterated its request for separate advances on costs. The Parties further elaborated on their respective positions on this issue in correspondence exchanged with the Secretariat on 14 and 15 August 2013.

31   Pursuant to the Procedural Timetable dated 25 June 2013, both Parties were to file any requests for the production of documents by 26 August 2013. In a letter dated 26 August 2013, the Claimant advised the Sole Arbitrator and the Respondent that it had decided not to request the production of documents from the Respondent at that stage, that the filing of the rejoinder brief was unnecessary, and that a telephone conference should be scheduled in order to discuss any resulting adjustments to the Procedural Timetable.

32   Under cover of a letter of the same date, 26 August 2013, the Respondent filed its First Request for the Production of Documents, comprising 155 individual requests. Both Parties commented on the nature and form of these requests in subsequent correspondence.

33   At its session of 12 September 2013, the ICC Court readjusted the advance on costs and increased it from USD 150'000 to USD 170'000, subject to later readjustments. At the same session, the ICC Court fixed separate advances on costs. The Secretariat informed the Parties that unless it received the payments for the readjusted advance on costs (USD 85'000 from the Respondent and USD 10'000 from the Claimant) by 27 September 2013, the separate advances on costs fixed by the ICC Court would apply (Article 36(3) ICC Rules). In a letter dated 24 October 2013, the Secretariat acknowledged receipt of USD 10'000 from the Claimant.

34    After further correspondence by both Parties, the Sole Arbitrator, in Procedural Order No. 3 dated 17 September 2013 ("**PO 3**"), invited the Respondent to re-file its document production requests in the form of a "Redfern Schedule". The Sole Arbitrator also clarified that, in principle, documents could only be ordered to be produced if they could serve to support factual allegations for which the requesting party bears the burden of proof.

35    On 2 October 2013, the Respondent submitted a revised version of its document production request (the "Document Production Request"). In a separate letter of the same day, the Respondent requested that the Sole Arbitrator refrain from using the standard set forth in PO 3 when deciding upon the Respondent's Request, and that he exclusively use the test set out in PO 2 and Article 3.3 of the IBA Rules on the Taking of Evidence (the "**IBA Rules**").

36    On 28 October 2013, the Claimant provided its reply to and comments on the Respondent's Request. In a separate letter of the same day, the Claimant advised that it was prepared to provide certain of the requested documents, but that it would require until 6 November 2013 to do so. This extension, to which the Respondent agreed, was granted by the Sole Arbitrator on the same day.

37    Still on the same day, 28 October 2013, in yet a separate letter, the Claimant asked the Sole Arbitrator to dismiss as unfounded the Respondent's application to revise and not apply parts of PO 3 to the Request.

38    On 1 November 2013, the Respondent commented on the replies given by the Claimant in the Redfern Schedule.

39    Under cover of a letter dated 6 November 2013, the Claimant provided a number of documents, organized in six groups (Group CP-A to CP-F), pointing out that this was done voluntarily, without the Claimant being obliged to produce them. In a separate letter of the same day, the Claimant commented on the Respondent's 1 November 2013 letter.

40    After further correspondence in this respect, the Sole Arbitrator issued Procedural Order No. 4 on 18 November 2013, deciding upon the

Respondent's Document Production Requests and inviting the Parties to hold a telephone conference in order to address the schedule for the subsequent steps of the procedure.

41   In the absence of payment by the Respondent, the Secretariat confirmed to the Parties that the separate advance on costs would apply and asked the Parties to make the corresponding payments (USD 125'000 for the Respondent and USD 50'000 for the Claimant) by 21 November 2013.

42   On 19 December 2013, the Parties advised the Sole Arbitrator that they were *"engaged in discussions concerning the proceedings"*. The Sole Arbitrator therefore suspended the proceedings and the next steps of the procedural calendar, first until 17 January 2014 and subsequently, upon the Parties' request, until 10 March 2014, when the Sole Arbitrator and the Parties held a procedural conference call in order to discuss the next steps of the proceedings.

43   The Respondent submitted two letters on 18 March 2014 concerning the next steps in the proceedings, proposing a new timetable and pointing to the alleged deficiencies regarding the documents produced by the Claimant. With respect to the latter, the Respondent argued:

- that the Claimant had not provided Call Details Reports ("**CDRs**") despite the fact that IACHASTA system used by the Claimant stores CDRs;

- that the Respondent should be entitled to send its own expert to the Claimant facilities to conduct its own inspection;

- that the Claimant had wrongly redacted certain documents including the Measurement Tables it produced; and

- that the disk sent by the Claimant was defective.

44   The Respondent also argued that its claim in relation to alleged seizure and removal of Respondent's equipment and the termination of Respondent's access to the IP circuits was not a counterclaim and it requested the Claimant should produce documents in relation to this claim.

ICC Case No. 18796/GZ/MHM

Award by Consent

45    The Claimant, in its letter of the same date, reiterated its position that a second round of written submissions would be futile. The Claimant alleged that the Respondent deliberately did not provide substantive defences in its Statement of Defense and deprived the Claimant of the opportunity to provide its full position on the defences of Respondent. The Claimant proposed a timetable for the future steps in the proceedings allowing the Parties to produce witness statements, expert reports, but no second round written submissions.

46    In a letter of 17 April 2014, the Secretary General granted the Respondent 15 days to pay the advance on costs in relation to its set-off claims, failing which the set-off claims would be considered withdrawn. The Secretariat also invited the Sole Arbitrator to suspend his work with respect to the Respondent's set-off claims until such payment was made.

47    In a letter of 1 May 2014, the Respondent objected to the Secretariat's decision and requested a decision from the ICC Court pursuant to Article 36(6) ICC Rules. The Respondent also protested that practice that the Secretariat forwarded its letters on this subject to the Sole Arbitrator.

48    In a letter dated 14 May 2014, the Secretariat informed the Parties and the Sole Arbitrator that the ICC Court had decided not to grant the Respondent an additional time limit to pay the separate advance on costs, failing which the set-off claims would be considered withdrawn pursuant to Article 36(6) ICC Rules. As the Respondent had objected to the application of Article 36(6) ICC Rules five days prior to the expiry of the time limit granted by the Secretary General, the Secretariat granted the Respondent five days to pay the separate advance on costs, in the amount of USD125'000.

49    Upon the Respondent's failure to pay the advance on costs, the Secretariat informed the Parties and the Sole Arbitrator on 6 June 2014 that the Respondent's set-off claims were considered withdrawn as of 2 June 2014, without prejudice to their reintroduction.

50    After further correspondence from the Parties in this respect, on 10 June 2014, the Sole Arbitrator issued Procedural Order No.5 concerning the Respondent's objections to documents produced by the Claimant and the

Respondent's request to carry out a site visit to the Claimant's facilities. The Sole Arbitrator decided as follows:

(1) The requests made by the Respondent in its letter dated 18 March 2014 are denied.

(2) Requests Nos. 50-52, a decision on which had been reserved in PO 4, are denied.

(3) The proceedings shall continue in accordance with the directions to be given in a separate Procedural Order.

51    On the same day, the Sole Arbitrator issued Procedural Order No. 6, addressing the Parties' requests concerning the second round of written submissions. The Sole Arbitrator decided as follows:

(1) The Parties' respective applications to revise the Procedural Timetable of 25 June 2013 are rejected.

(2) The procedural steps in Steps Nos. 7-15 of the Procedural Timetable of 25 June 2013 remain unchanged, with the exception of the dates and time limits set out therein.

(3) The Parties are invited to comment on the revised dates suggested in the attached draft revised Procedural Timetable, by **18 June 2014**.

52    Both Parties commented on the draft revised Procedural Timetable on 18 June 2014. In the meantime, in letters of 18 June 2014, 25 and 26 June 2014, the Respondent reiterated its requests to allow its expert to conduct inspections at the Claimant's facility and for the Sole Arbitrator to order the Claimant to produce CDRs. The Claimant, objected to the Respondent's requests in a letter of 25 June 2014.

53    On 1 July 2014, Sole Arbitrator issued Procedural Order No. 7, rejecting the Respondent's requests for physical inspection and additional document production since he could not "*see any elements that have not already been taken into consideration when rendering PO 5 or that would otherwise justify revising the decisions reached therein*". The Sole Arbitrator also issued a Revised Procedural Timetable.

54    The Claimant filed its Rejoinder Statement on 13 August 2014 (the **"Rejoinder"**), including an expert report of Mr Stephan Knauf, an Addendum to Expert Witness Report of Mr Oscar Gonzalez Soto, an expert report of Mr Arian Sinorimeri, and witness statements of Ms Elda Bejleri and Ms Vjollca Mazi-Dervishi.

55    In a letter dated 27 August 2014, the Respondent requested an extension of the time limit to submit its rebuttal submission, reiterated its request that its expert be allowed to conduct a physical inspection at the Claimant's facilities, and applied for parts of the Rejoinder to be struck from the record. The Claimant objected to the Respondent's requests in a letter of 2 September 2014.

56    On 11 September 2014, the Sole Arbitrator issued Procedural Order No. 8, along with the revised Procedural Timetable, deciding as follows:

> (1) The time limit for the Respondent to submit its Rebuttal is extended until Monday, 20 October 2014;

> (2) The time limit for Step 9 of the Procedural Timetable is extended accordingly, until Thursday, 23 October 2014;

> (3) The Respondent's request to allow its expert to conduct a physical inspection at the Claimant's facilities is rejected;

> (4) The Respondent's request to strike the Claimant's Rejoinder submission, including all witness statements, expert reports, and documentary evidence, from the record, is rejected.

57    On 15 October 2014, the Respondent informed the Sole Arbitrator that the Parties were *"engaged in serious settlement discussions"* and that they were *"very close to resolving their differences"*.

58    On 17 October 2014, the Respondent advised the Sole Arbitrator that the Parties had reached a settlement and requested, both for itself and on behalf of the Claimant, that the Sole Arbitrator extend all upcoming time limits, to allow the Parties sufficient time to finalise the settlement agreement.

59   On 19 October 2014, the Claimant having confirmed the Respondent's request, the Sole Arbitrator stayed the proceedings until 31 October 2014 and cancelled the hearing schedule for 1-5 December 2014.

60   On 3 November 2014, the Claimant requested that the Sole Arbitrator further stay the proceedings until 7 November 2014, in light of the ongoing settlement negotiations. On 4 November 2014, upon confirmation from the Respondent, the Sole Arbitrator extended the stay of the proceedings until 7 November 2014.

61   On 12 November 2014, the Sole Arbitrator inquired with the Parties whether the proceedings should resume or whether a further stay was requested by the Parties. On the same day, the Respondent informed the Sole Arbitrator that negotiations were still pending, while Counsel for the Claimant stated that it was awaiting its client's instructions regarding a further extension of the stay of the proceedings.

62   On 14 November 2014, the Claimant informed the Sole Arbitrator that the settlement negotiations had failed and requested the resumption of the present proceedings.

63   It followed an exchange of correspondence in which the Respondent argued that that a binding settlement had been reached and, accordingly, the present proceedings should be closed immediately, while the Claimant reiterated that there was no binding settlement agreement between the Parties. The Respondent also objected to the Claimant's suggestion that it could raise the question of the existence of a settlement in its Statement of Rebuttal, as this would force the Respondent to incur additional costs in a case that had already been settled. In addition, the Respondent argued that the Sole Arbitrator would lose his impartiality if he were to review the alleged settlement agreement or the correspondence surrounding it. Furthermore, as pointed out by the Claimant, the Respondent was precluded from raising issues relating to the settlement before the Sole Arbitrator in light of the confidentiality of the negotiations and the alleged settlement agreement. Finally, the Respondent requested that *the present matter be stayed in order to preserve the status quo and to allow Unifi to commence a separate action to enforce the parties' settlement agreement*.

64   On 24 November 2014, the Sole Arbitrator issued Procedural Order No. 9, as follows:

> (1) The Parties are directed to refrain from introducing in the present proceedings any information, correspondence, or other documents stemming from confidential settlement negotiations between them.
>
> (2) The Respondent's request to terminate the present proceedings is rejected.
>
> (3) The Respondent's request to stay the present proceedings is rejected. Accordingly, the proceedings shall resume as of the date of the present Order.
>
> (4) The time limit for the Respondent to submit its Statement of Rebuttal is extended until **12 December 2014**.
>
> (5) The remaining time limits will be adjusted accordingly and a revised procedural timetable issued shortly.
>
> (6) The Sole Arbitrator suggests that the Evidentiary Hearing be held either during the week of **2-6 March 2015** or during the week of **16-20 March 2015**. The Parties are invited to confirm, **by 26 November 2014**, their availability on these dates.

65   After further exchanges of correspondence, on 5 December 2014, the Sole Arbitrator invited the Parties to reserve the week of 4 May 2015 for the Evidentiary Hearing.

66   On 2 December 2014, the Respondent informed the Sole Arbitrator and the Claimant that Mr Daniel Hochstrasser and Ms Simone Stebler of Bär & Karrer had joined the Counsel team for the Respondent.

67   On 5 December 2014, the Respondent filed a procedural motion, requesting the Sole Arbitrator to reconsider Procedural Order No. 9 as to his jurisdiction on deciding whether a valid settlement agreement has been concluded between the Parties and to admit evidence on the settlement negotiations (the "**Procedural Motion**"). In the alternative,

the Respondent asked the Sole Arbitrator to stay the proceedings in order to preserve the *status quo* and allow the Respondent to initiate separate proceedings for enforcing the settlement agreement.

68    On 12 December 2014, the Claimant objected to the Respondent's Procedural Motion, arguing that the alleged settlement agreement was confidential and, in any event, separate from the agreement underlying this dispute, so that the Sole Arbitrator lacked jurisdiction over it. The Respondent submitted further comments on 16 December 2014.

69    The Respondent filed its Rebuttal Submission on 17 December 2014, the time limit for doing so having been extended, including witness statements by Mr Philip Walker and Mr Adrian Shatku.

70    On 14 January 2015, the Sole Arbitrator invited the Parties to submit their observations on the following issues:

> 1 what, if any, additional written submissions are necessary or would be helpful in advance of the Evidentiary Hearing;
>
> 2 whether a joint expert report should be filed by the Parties' experts and, if so, which experts should participate in such a report; and
>
> 3 whether the Sole Arbitrator should consider appointing an expert himself and, if so, which questions such an expert should address?
>
> 4 what type of evidence the Respondent would intend to submit in support of its allegation that "*the Parties rather agreed that their negotiations and the agreed terms may be disclosed if and to the extent necessary for the enforcement of the settlement*" (Procedural Motion, para. 14);
>
> 5 what type of evidence the Parties would submit in support of their respective positions that a settlement agreement was or was not entered into (witness evidence, correspondence, draft agreements, other);
>
> 6 whether the relevant documentary evidence in this respect (if any) can be produced in redacted form, so as to hide the substance

of any agreement that was contemplated by the Parties by way of a settlement, or the content of any offers made by either Party in this respect; and

7 whether the Parties, at any stage of their settlement negotiations, addressed the question of which court or tribunal would have jurisdiction over disputes arising from the negotiations and/or any settlement agreement that was being negotiated?

71   The Parties provided their views on these questions in letters dated 20 January 2015 (Respondent) and 6 February 2015 (Claimant), an extension for doing so having been granted to the Claimant. On 20 February 2015, the Parties and the Sole Arbitrator held a procedural conference call, discussing the Respondent's Procedural Motion and the procedural steps leading up to the Evidentiary Hearing.

72   Amongst other things, the Sole Arbitrator confirmed that, in light of the Claimant's agreement, he would allow pleadings and witness evidence on the Settlement Issue, but that he was not minded to bifurcate the proceedings and to hear and decide upon the settlement issue before addressing the remainder of the merits of the dispute, unless the Parties could jointly agree on a timetable and procedure that would allow doing so without incurring significant delay.

73   The Parties having been unable to reach any agreement in this respect, on 4 March 2015, the Sole Arbitrator issued Procedural Order No. 10, ordering as follows:

(1) The Respondent is invited to file its submission on the Settlement Issue, including any documentary and/or witness evidence, by 13 March 2015; the Claimant shall file its Reply Submissions on the Settlement Issue, including any documentary and/or witness evidence, by 2 April 2015.

(2) In making their submission on the Settlement Issue, the Parties shall take all necessary measures, including the redaction of documents, to prevent the disclosure of any substantive settlement offers or admissions with respect to the merits of the dispute not already on the record. Any such information that is nevertheless

18

disclosed, be it based on pleading, documentary evidence, or witness evidence, will be struck from the record.

(3) The Respondent's request that the proceedings be bifurcated so as to decide the Settlement Issue before the remainder of the merits of the dispute is rejected.

(4) Any witness evidence on the Settlement Issue will be heard as part of the Evidentiary Hearing on 4-8 May 2015.

(5) The Claimant shall file its reply to Sections III.A.i. and III.H. of the Respondent's Statement of Rebuttal, including any documentary and/or witness evidence, by 13 March 2015; the Respondent is at liberty to comment on this submission, by 2 April 2015.

(6) The Respondent's renewed request that its expert be allowed to conduct a physical inspection at the Claimant's facilities in Durres and Tirana is rejected.

(7) The Respondent's subsidiary application that the Sole Arbitrator appoint an expert to carry out such an inspection is rejected.

(8) All other procedural applications are rejected.

(9) A revised Procedural Timetable is enclosed. The Parties are invited to advise of their availabilities at the suggested dates for a prehearing conference call, by 10 March 2015.

74   On 13 March 2015, the Respondent submitted its Submissions on the Settlement Agreement.

75   On the same day, the Claimant submitted its Comments on Sections III.A.i and III.H. of the Respondent's Statement of Rebuttal.

76   On 2 April 2015, the Respondent submitted its Comments on the Claimant's Submission of 13 March 2015.

77   On the same day, the Claimant submitted its Reply to Respondent's Submission regarding Settlement Agreement.

78   In a letter of 3 April 2015, the Secretariat informed the Parties that, on 2 April 2015, the ICC Court had readjusted the advance on costs and increased it from USD 135'000 to USD 195'000, and requested that the Respondent pay the amount of USD 60'000 by 17 April 2015.

79   As explained in more detail below, the Parties subsequently arrived at a settlement of the dispute, leading to a stay of the present proceedings and the cancellation of the evidentiary hearing.

## 4   THE ARBITRATION AGREEMENT

80   The Request is based on Clause 21.2 of the Interconnection Agreement, which provides:

> The Parties shall attempt in good faith negotiations to adjust and dispose of any disagreement or dispute, which may arise between them regarding the interpretation, the performance of, or the failure to perform under this Agreement. Should an agreement not be reached between the Parties, the dispute shall be finally settled by arbitration according to the Rules of Conciliation and Arbitration of the International Chamber of Commerce (ICC) by one or more arbitrators appointed in accordance with the said Rules. The arbitration shall be held in Zurich (Switzerland) and shall be conducted in English language.

81   The validity of the arbitration agreement and the jurisdiction of the Sole Arbitrator to decide upon the dispute between the Parties have not been contested by the Respondent (see, para. 167 Statement of Defense).

## 5   RULES OF LAW APPLICABLE TO THE MERITS OF THE DISPUTE

82   Pursuant to Article 21(1) ICC Rules, "[t]*he Parties shall be free to agree upon the rules of law to be applied by the arbitral tribunal to the merits of the dispute. In the absence of any such agreement, the arbitral tribunal shall apply the rules of law which it determines to be appropriate*". Article 21(2) ICC Rules goes on to provide that "[t]*he arbitral tribunal shall take account of the provisions of the contract, if any, between the parties and of any relevant trade usages*".

83    Pursuant to its Clause 21.1, the Interconnection Agreement is governed by Swiss law (*"This Agreement shall be governed by the laws of Switzerland."*). Accordingly, Swiss law is the law applicable to the merits of the dispute between the Parties.

84    However, the Respondent submitted that other laws, regulations or authorities were applicable to or govern certain aspects of the Parties' Agreement. In particular, the Respondent submits that *"while the Agreement references Swiss law, various aspects of the parties' relationship and the Agreement will be governed by U.S. and/or Albanian law"* (p. 6 Answer), regulations, or authorities.

## 6    BACKGROUND OF THE DISPUTE

85    The dispute arose out of the Interconnection Agreement, pursuant to which Albtelecom was to grant Unifi access to its telecommunication network, against an agreed upon fee. Under Clause 1 of the Agreement, the Parties agreed *"to establish a direct link for international telecommunications services between Albania and the rest of the World as well as to provide operation and maintenance of the necessary facilities for the service implementation in accordance with the terms and conditions specified in this Agreement and in the relevant Appendices"*.

86    The Claimant submits that it provided the agreed telecommunication services under the Agreement between August 2006 and November 2007, services for which it invoiced total fees in the amount of USD 8'396'360.

87    It is not disputed that the Respondent paid a total amount of over USD 3.7 million to the Claimant and that it stopped making any payments in June 2007.

88    The Parties disagree over what amounts were and are in fact due to the Claimant.

89    On 16 November 2007, on the basis of what it considered be an unjustified failure by the Respondent to pay its dues, the Claimant interrupted the Respondent's connection to the Claimant's network.

ICC Case No. 18796/GZ/MHM

Award by Consent

# 7   THE PARTIES' POSITIONS AND RELIEF SOUGHT IN THE ARBITRATION

## 7.1   The Claimant's Position and Relief Sought

90   The Claimant asserts that, from the very beginning of their cooperation, i.e., since August 2006, the Respondent never paid the full amount due under the monthly invoices issued by the Claimant. As of June 2007, the Respondent entirely failed to make any payment, leaving an outstanding balance of fees in the amount of USD 4'609'689.10, for the period up until November 2007.

91   The Claimant further argues that "*the Respondent has not provided any services to the Claimant pursuant to the Agreement or otherwise and the Claimant does not owe any monies to the Respondent*" (para. 9 Request).

92   The Claimant requests the following relief in its Statement of Claim, as confirmed in its Rejoinder:

The Claimant respectfully requests that the Arbitral Tribunal:

1. order the Respondent to pay to the Claimant a principal amount of no less than USD 4,609,689;

2. order the Respondent to pay to Claimant interest on the principal amount in line with the Agreement;

3. order the Respondent to pay all costs of the arbitration proceedings, including the administrative fees and costs for the ICC, the fees and costs of the Tribunal and the legal and other costs incurred by Albtelecom in these proceedings;

4. award such other relief as might be deemed appropriate.

## 7.2   The Respondent's Position and Relief Sought

93   The Respondent denies the Claimant's claims and submits that they must be dismissed in their entirety. According to the Respondent, the Claimant failed to perform certain conditions precedent under the Agreement and failed to perform its obligations thereunder. Furthermore, the invoices

22

relied upon by the Claimant were "*inaccurate, without support, and reflect charges in excess of the rates/charges/tariffs agreed upon by the parties*" and in excess of those allowed under applicable law, "*including Albanian law and regulations controlling the provision of telecommunication services, as well as in excess of applicable and agreed upon rates*" (p. 4 Answer).

94    The Respondent alleges that the Claimant's decision to interrupt the Respondent's connection to the Claimant's network was improper and arbitrary, leading to a loss in revenue and associated profits on the Respondent's part in excess of USD 250'000. In addition, the Claimant "*improperly seized and removed Unifi's telecommunications equipment valued at approximately US$500'000*" (p. 4 Answer).

95    While the relief requested by the Respondent evolved during the proceedings, in its latest written submission, i.e., its Rebuttal, the Respondent asked the Sole Arbitrator to:

(i) Deny in entirety the relief sought by Alb in its Full Statement of Claim and Rejoinder;

(ii) Declare Unifi is not bound by any agreement on the rates because Alb withheld critical information which caused Unifi to act under error, that the rates applied by Alb were not in compliance with Albanian law and regulations, and that Alb's traffic measurements are inaccurate;

(iii) Order Alb to compensate Unifi for all of its arbitration costs, including legal fees;

(iv) Order Alb alone to pay all costs, fees and expenses due to the Arbitral Tribunal and the International Chamber of Commerce, including, but not limited to the administrative fees; and

(v) Award such other relief as the Arbitral Tribunal deems just.

## 8   THE PARTIES' SETTLEMENT

96   On 16 April 2015[1], the Parties entered into the following Settlement Agreement (reproduced in full below):

Dated

16 April 2015

Settlement Agreement

Made in view of an

AWARD BY CONSENT

Art. 32 of the ICC rules

*between*

Albtelecom Sh.A.

*and*

Unifi communications, Inc

Table of Contents

1.  DEFINITIONS AND INTERPRETATION   4
2.  PAYMENTS   4
3.  COSTS   5
4.  MUTUAL GENERAL RELEASE   5
5.  NOTICE AND CURE 5
6.  WARRANTIES AND AUTHORITY  6
7.  CO-OPERATION   6
8.  NO ADMISSION   6
9.  SEVERABILITY   7
10. ENTIRE AGREEMENT   7
11. CONFIDENTIALITY & NON-DISPARAGEMENT  7
12. EFFECT OF THIS SETTLEMENT AGREEMENT   8

---

[1]   The Parties have confirmed in their e-mails dated 1 September 2015 that 16 August 2015 is indeed the effective date of the Settlement Agreement, as it appears from its cover page.

ICC Case No. 18796/GZ/MHM

Award by Consent

13. GOVERNING LAW AND ARBITRATION   8

14. COUNTERPARTS   9

15. VARIATION   9

ANNEX : PAYMENT SCHEDULE FOR INSTALMENTS   10

## PARTIES

(1) Albtelecom Sh.A., a company incorporated under the laws of the Republic of Albania with its principal office and place of business at Autostrada Tiranë – Durrës, km 7, Kashar, Tirana, Albania ("Albtelecom").

(2) Unifi Communications, Inc., a company organized under the laws of the State of New York, United States of America, with its principal office and place of business at 60 Broad Street, 38th Floor, New York, NY 10004, USA (**"Unifi"**).

(jointly **the "Parties"** and each individually a "**Party**").

## BACKGROUND

(A) On 29 June 2012, Albtelecom commenced ICC arbitration proceedings against Unifi (ICC arbitration case No. 18796/GZ/MHM) ("**Arbitration Proceedings**"), claiming a principal amount of USD 4,609,689.00 plus interest ("**Released Claims**"), based on an agreement between the Parties on international telecommunications services, dated 8 August 2006 ("**Interconnection Agreement**");

(B) On or around 24 July 2013, Unifi filed with the ICC International Court of Arbitration its full statement of defense in which it denied the allegations set forth in Albtelecom's full statement of claim and asserted defenses and offsets to the claims raised by Albtelecom concerning its invoices.

(C) In order to settle the above dispute, the Parties first discussed the terms of a Memorandum of Understanding. Then, instead of finalizing and formalizing that Memorandum, they decided to work towards a settlement agreement.

(D) By the following settlement agreement (the "**Settlement Agreement**"), the Parties wish to resolve all of the claims related to the Arbitration Proceedings.

(E) The Parties agree that the terms of their settlement shall be incorporated into a consent award, as part of the Arbitration Proceedings, pursuant to art. 32 of the ICC Rules of Arbitration ("**Consent Award**").

## AGREED TERMS

## 1. DEFINITIONS AND INTERPRETATION

In this Settlement Agreement, unless the context otherwise requires, the following words and expressions have the following meanings:

**Arbitration Proceedings:** has the meaning given to it in Background (A).

**Consent Award:** has the meaning given to it in Background (E).

**Consent Award Clauses:** has the meaning given to it in clause 12.2.

**Down Payment:** has the meaning given to it in clause 2.2.

**Effective Date:** has the meaning given to it in clause 12.1.

**ICC:** the International Chamber of Commerce.

**Interconnection Agreement:** has the meaning given to it in Background (A).

**Payment Schedule:** the document prepared as provided in clause 2.3 and to be annexed as an Annex.

**Related Parties:** a party's parent, subsidiaries, assignees, transferees, representatives, principals, agents, officers or directors.

**Released Claims:** has the meaning given to it in Background (A).

**Settlement Agreement:** has the meaning given to it in Background (D).

## 2. PAYMENTS

2.1 Unifi shall pay to Albtelecom the sum of EUR 1,400'000.00.- (the "**Compromised Sum**"), according to the modalities set out in clauses 2.2 and 2.3.

2.2 Unifi shall pay to Albtelecom a down payment of EUR 200'000.00.- by way of bank transfer on the date of the signature of this Settlement Agreement.

2.3 Unifi shall pay the amount of EUR 1,200'000.00.- in instalments payable by way of bank transfer as per the schedule set forth in the Annex.

2.4 Should Unifi fail to make its payments in line with the terms set out in this clause 2 and fail to cure the same according to clause 5, Albtelecom shall be entitled to claim forthwith the amount of EUR 2,100'000.00.- less any payments made to date.

2.5 All payments overdue under this Settlement Agreement shall bear interest at the rate of 2.5% per year.

## 3. COSTS

The Parties shall each bear their own legal costs in relation to the Settlement Agreement and the Arbitration Proceedings.

## 4. MUTUAL GENERAL RELEASE

The Parties, each on behalf of themselves and on behalf of their respective legal representatives, officers, directors, employees, agents, successors and assigns, release each other from all actions, causes of action, claims, demands, damages (including compensatory, exemplary, statutory and punitive damages), attorney fees, costs, and matters of any kind that any of them individually or in any representative capacity has or has ever had against the others, including but not limited to, any claims arising out of the Interconnection Agreement and/or the Arbitration

27

ICC Case No. 18796/GZ/MHM

Award by Consent

Proceedings. This release does not include the parties' respective obligations under this Settlement Agreement.

## 5. NOTICE AND CURE

Should a Party fail to perform its obligations under the Settlement Agreement in due time, the other Party shall notify the defaulting Party in writing of the failure. The Party in breach will have 15 (fifteen) business days to remedy the failure, from the date when notice is received.

## 6. WARRANTIES AND AUTHORITY

6.1 Each Party warrants and represents that it has not sold, transferred, assigned or otherwise disposed of its interest in the Released Claims.

6.2 Each Party warrants and represents to the other with respect to itself that it has the full right, power and authority to execute, deliver and perform this Settlement Agreement.

## 7. CO-OPERATION

7.1 The Parties shall employ good faith efforts towards entering into a business agreement between themselves. The Parties shall not be deemed to have breached their duty to employ good faith efforts, should they fail to reach such an agreement.

7.2 Unifi shall submit its business proposal ("**Business Proposal**") within the fifth and sixth month after the Effective Date. In compliance with the aforementioned duty to employ good faith efforts, the Business Proposal shall be consistent with good business judgment and sound commercial practice and be supported by well-substantiated relevant economical and financial data and appropriate market studies.

7.3 The Parties shall negotiate either in writing, by telephone or in meeting(s) at Albtelecom's premises.

28

7.4 A Party shall be deemed to have negotiated in good faith as long as it has been available to discuss the other Party's proposal during a two week period.

7.5 Only gross violations of a Party's duty to employ good faith efforts shall be considered as a breach of contract.

7.6 The Parties' co-operation obligation shall not be construed or understood as preventing, hindering or otherwise restricting Albtelecom's right to receive the payments as per clause 2 and to enforce the Consent Award pursuant to the New York Convention.

## 8. NO ADMISSION

This Settlement Agreement is not, and shall not be represented or construed by the Parties as being an admission of liability or wrongdoing on the part of either Party or any other person or entity.

## 9. SEVERABILITY

If any provision of this Settlement Agreement is found to be void or unenforceable, that provision shall be deemed to be deleted from this Settlement Agreement and the remaining provisions of this Settlement Agreement shall continue in full force and effect and the Parties shall use their respective reasonable endeavours to procure that any such provision is replaced by a provision which is valid and enforceable, and which gives effect to the spirit and intent of this Settlement Agreement.

## 10. ENTIRE AGREEMENT

10.1     This Settlement Agreement constitutes the entire understanding and agreement between the Parties in relation to the subject matter of this Settlement Agreement.

10.2     Each Party acknowledges that it has not entered into this Settlement Agreement in reliance wholly or partly on any representation or warranty made by or on behalf of the other Party

(whether orally or in writing) other than as expressly set out in this Settlement Agreement.

## 11. CONFIDENTIALITY & NON-DISPARAGEMENT

11.1     The terms of this Settlement Agreement, and the substance of all negotiations in connection with it, are confidential to the parties and their advisers, who shall not disclose them to, or otherwise communicate them to, any third party without the written consent of the other party other than:

    *(a)*   to the Sole Arbitrator of the Arbitration Proceedings and the ICC Secretariat; and

    (b)   to the parties' respective auditors, insurers and lawyers on terms which preserve confidentiality; and

    (c)   pursuant to an order of a court of competent jurisdiction or pursuant to any proper order or demand made by any competent authority or body where they are under a legal or regulatory obligation to make such a disclosure; and

    (d)   as far as necessary to implement and enforce any of the terms of this Settlement Agreement.

11.2     Each Party agrees to take no action which is intended, or would reasonably be expected, to harm the other Party, its reputation or its products, or which would reasonably be expected to lead to unwanted or unfavourable publicity to that other Party.

## 12. EFFECT OF THIS SETTLEMENT AGREEMENT

12.1     The Parties hereby agree that the Settlement Agreement shall enter into force upon signature by their authorized officials ("**Effective Date**").

12.2     Within 1 (one) week from the Effective Date, the Parties shall jointly and irrevocably request the Arbitral Tribunal to issue the Consent Award which shall in its general part (grounds of the award) reproduce the Settlement Agreement and in its

decision (rulings) reproduce clause 2 as well as the Annex of the Settlement Agreement.

12.3     Should a Consent Award not be rendered within 60 (sixty) business days from the Effective Date, this Settlement Agreement shall expire automatically unless both Parties mutually agree to an extension of time. In such event, either Party shall be fully entitled to continue the Arbitral Proceedings.

## 13. GOVERNING LAW AND ARBITRATION

13.1     The Settlement Agreement is governed by and construed in accordance with the laws of Switzerland.

13.2     All disputes, save those related to clause 2, arising out of this Settlement Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the said Rules. The seat of arbitration shall be Geneva, Switzerland. The language to be used in the arbitral proceedings shall be English.

## 14. COUNTERPARTS

This Settlement Agreement shall be signed in two of counterparts, each of which shall be an original and all of which together evidence the same Settlement Agreement.

## 15. VARIATION

Any amendment to this Settlement Agreement shall be in writing and signed by or on behalf of each Party.

By their signature the Parties declare to be bound by the terms of this Settlement Agreement.

ALBTELECOM acting by İzzet Serhat Demir, a Board Member and Erkan Tabak, General Director

[signature].......................
Board Member
[signature]................................
General Manager

ICC Case No. 18796/GZ/MHM

Award by Consent

Unifi acting by Adrian Shatku, CEO and Director, in the presence of:

[signature]................................
CEO and Director

……………………………
Witness

## ANNEX: PAYMENT SCHEDULE FOR INSTALMENTS

The amount of EUR 1,200'000.00.- shall be divided into 43 instalments payable as follows:

the amount of **EUR 28'000.-** to be paid on or before **16 May 2015**

the amount of **EUR 28'000.-** to be paid on or before **16 June 2015**

the amount of **EUR 28'000.-** to be paid on or before **16 July 2015**

the amount of **EUR 28'000.-** to be paid on or before **16 August 2015**

the amount of **EUR 28'000.-** to be paid on or before **16 September 2015**

the amount of **EUR 28'000.-** to be paid on or before **16 October 2015**

the amount of **EUR 28'000.-** to be paid on or before **16 November 2015**

the amount of **EUR 28'000.-** to be paid on or before **16 December 2015**

the amount of **EUR 28'000.-** to be paid on or before **16 January 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 February 2016**

ICC Case No. 18796/GZ/MHM                                    Award by Consent

the amount of **EUR 28'000.-** to be paid on or before **16 March 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 April 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 May 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 June 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 July 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 August 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 September 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 October 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 November 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 December 2016**

the amount of **EUR 28'000.-** to be paid on or before **16 January 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 February 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 March 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 April 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 May 2017**

ICC Case No. 18796/GZ/MHM                                      Award by Consent

the amount of **EUR 28'000.-** to be paid on or before **16 June 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 July 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 August 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 September 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 October 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 November 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 December 2017**

the amount of **EUR 28'000.-** to be paid on or before **16 January 2018**

the amount of **EUR 28'000.-** to be paid on or before **16 February 2018**

the amount of **EUR 28'000.-** to be paid on or before **16 March 2018**

the amount of **EUR 28'000.-** to be paid on or before **16 April 2018**

the amount of **EUR 28'000.-** to be paid on or before **16 May 2018**

the amount of **EUR 28'000.-** to be paid on or before **16 June 2018**

the amount of **EUR 28'000.-** to be paid on or before **16 July 2018**

the amount of **EUR 28'000.-** to be paid on or before **16 August 2018**

the amount of **EUR 28'000.-** to be paid on or before **16 September 2018**

the amount of **EUR 28'000.-** to be paid on or before **16 October 2018**

the amount of **EUR 24'000.-** to be paid on or before **16 November 2018**.

## 9   COMMUNICATIONS AFTER THE SETTLEMENT AGREEMENT

97   On 17 April 2015, both Parties informed the Sole Arbitrator that they had entered into the Settlement Agreement.

98   Upon the Parties' joint request, the Sole Arbitrator, in an e-mail of 18 April 2015, stayed the proceedings until 29 May 2015 and cancelled the evidentiary hearing.

99   On 19 April 2015, the Secretariat informed the Parties that, in light of the stay of the arbitration, the payment obligations as per the Secretariat's letter of 3 April 2015 were suspended.

100   On 21 April 2015, the Claimant, on behalf of both Parties, informed the Sole Arbitrator that they had agreed to ask the Sole Arbitrator *"to issue a Consent Award which shall in its general part (grounds for the award) reproduce the Settlement Agreement and in its decision (ruling) reproduce clause 2 as well as the Annex of the Settlement Agreement."* It further requested leave to provide the Arbitral Tribunal with a draft of the Consent Award.

101   On 23 April 2015, the Sole Arbitrator requested the Parties to provide him instead with the text of what they referred to as the "grounds for the award" and of the ruling.

102   On 5 June 2015, the Claimant, on behalf of both Parties, provided to the Sole Arbitrator an electronic copy of the Settlement Agreement, as well as a document incorporating a part of the procedural case history, the text of the Settlement Agreement, as well as proposed rulings. The Claimant further advised that Sole Arbitrator that "[t]*he Parties initially*

*anticipated that the consent award could be finalized within two months from the date of signature of the settlement agreement (see 12.3 of the Agreement). Given the long time it took to prepare the attached draft, the Parties agree that the time frame for the finalization of the award shall be extended until 26 June 2015".*

103    As part of the document provided to the Sole Arbitrator, the Parties further confirmed that, on 17 April 2015, Unifi effected the down-payment to Albtelecom in the amount of EUR 200'000, pursuant to Clause 2.2 of the Settlement Agreement, and, on 15 May 2015, the first instalment of EUR 28'000, as per the Payment Schedule for Instalment in the Annex to the Settlement Agreement.

104    In an e-mail of the same date, 5 June 2015, the Sole Arbitrator drew the Parties' attention to the fact that the suggested time limit of 26 June 2015 for the rendering of the finalized Award by Consent was unlikely to be achievable, given that not only a final, agreed text of the Award needed to be prepared, but that the ICC Court would have to scrutinize and approve this text, as well as fix the arbitration costs of the proceedings.

105    The Sole Arbitrator provided a draft of the present Award by Consent to the Parties on 16 June 2015, for their review and comment.

106    The Parties commented on the draft on 3 July and 7 July 2015, respectively, suggesting minor changes which the Sole Arbitrator found to be acceptable and thus adopted in the revised draft of the Award by Consent.

107    For the avoidance of doubt, the Parties clarified that under the Settlement Agreement: (a) each of the Parties shall bear the legal fees and expenses of its own legal counsel in respect of the subject arbitration proceedings and (b) the costs of arbitration fixed by the ICC Court shall be borne by the Claimant (Claimant's email dated 15 July 2015 and Respondent's email dated 14 July 2015).

108    The proceedings were closed pursuant to Article 27 ICC Rules on 29 July 2015.

109    In e-mails dated 1 September 2015, the Parties confirmed that they had agreed to further extend the time limit for the award by consent, until

15 September 2015. In the same e-mails, the Parties confirmed that the Respondent had, in the meantime, effected the second, third, and fourth instalments of EUR 28'000 each, which, as per the Payment Schedule for Instalment in the Annex to the Settlement Agreement, had been due to be paid before 16 June, 16 July, and 16 August 2015, respectively.

110     The Sole Arbitrator took these elements, as well as comments on the draft of the present Award by Consent received from the ICC Court in the context of its scrutiny, into account when finalizing the present Award by Consent.

111     The current time limit for rendering the final award, as extended by the ICC Court pursuant to Article 30(2) ICC Rules, is 30 September 2015.

## 10   CONSIDERATIONS OF THE SOLE ARBITRATOR

112     Pursuant to Article 32 ICC Rules, "[i]*f the parties reach a settlement after the file has been transmitted to the arbitral tribunal in accordance with Article 16, the settlement shall be recorded in the form of an award made by consent of the parties, if so requested by the parties and if the arbitral tribunal agrees to do so*".

113     In the present case, the case file has been transmitted to the Sole Arbitrator well before the settlement occurred. As summarized above, the proceedings have been ongoing – with interruptions resulting from agreed-upon stays – for over two years.

114     According to paragraph (E) of the "Background" section of the Settlement Agreement, a signed electronic copy of which has been provided by the Parties to the Sole Arbitrator, the Parties "*agree that the terms of their settlement shall be incorporated into a consent award, as part of the Arbitration Proceedings, pursuant to art. 32 of the ICC Rules of Arbitration*". The Claimant, on behalf of both Parties, applied to the Sole Arbitrator for such an award by consent in its e-mail dated 21 April 2015. The Respondent confirmed this request by email dated 14 July 2015.

115   Against this background, and in the absence of any public policy-based concerns against the rendering of an award by consent, the Sole Arbitrator agrees to render an award by consent.

## 11   COSTS

116   The costs of arbitration have been fixed by the ICC Court at its session of 13 August 2015 at USD 115'000. This amount includes the administrative expenses and the Sole Arbitrator's fees and expenses.

117   Pursuant to Article 3 of the Settlement Agreement, and as reconfirmed above, the Parties agree that they shall each bear their own legal costs in relation to the Settlement Agreement and the arbitration proceedings.

## 12   DISPOSITIVE PART

118   Based on the foregoing, and bearing in mind those payments due under the Settlement Agreement that – as both Parties have confirmed – have already been made, the Sole Arbitrator issues the present Award by Consent:

  i.   Unifi shall pay the amount of EUR 1'088'000.00 in instalments payable by way of bank transfer as per the following schedule:

    (1)   the amount of EUR 28'000.00 to be paid on or before 16 September 2015

    (2)   the amount of EUR 28'000.00 to be paid on or before 16 October 2015

    (3)   the amount of EUR 28'000.00 to be paid on or before 16 November 2015

    (4)   the amount of EUR 28'000.00 to be paid on or before 16 December 2015

    (5)   the amount of EUR 28'000.00 to be paid on or before 16 January 2016

    (6)   the amount of EUR 28'000.00 to be paid on or before 16 February 2016

(7) the amount of EUR 28'000.00 to be paid on or before 16 March 2016

(8) the amount of EUR 28'000.00 to be paid on or before 16 April 2016

(9) the amount of EUR 28'000.00 to be paid on or before 16 May 2016

(10) the amount of EUR 28'000.00 to be paid on or before 16 June 2016

(11) the amount of EUR 28'000.00 to be paid on or before 16 July 2016

(12) the amount of EUR 28'000.00 to be paid on or before 16 August 2016

(13) the amount of EUR 28'000.00 to be paid on or before 16 September 2016

(14) the amount of EUR 28'000.00 to be paid on or before 16 October 2016

(15) the amount of EUR 28'000.00 to be paid on or before 16 November 2016

(16) the amount of EUR 28'000.00 to be paid on or before 16 December 2016

(17) the amount of EUR 28'000.00 to be paid on or before 16 January 2017

(18) the amount of EUR 28'000.00 to be paid on or before 16 February 2017

(19) the amount of EUR 28'000.00 to be paid on or before 16 March 2017

(20) the amount of EUR 28'000.00 to be paid on or before 16 April 2017

(21) the amount of EUR 28'000.00 to be paid on or before 16 May 2017

(22)   the amount of EUR 28'000.00 to be paid on or before 16 June 2017

(23)   the amount of EUR 28'000.00 to be paid on or before 16 July 2017

(24)   the amount of EUR 28'000.00 to be paid on or before 16 August 2017

(25)   the amount of EUR 28'000.00 to be paid on or before 16 September 2017

(26)   the amount of EUR 28'000.00 to be paid on or before 16 October 2017

(27)   the amount of EUR 28'000.00 to be paid on or before 16 November 2017

(28)   the amount of EUR 28'000.00 to be paid on or before 16 December 2017

(29)   the amount of EUR 28'000.00 to be paid on or before 16 January 2018

(30)   the amount of EUR 28'000.00 to be paid on or before 16 February 2018

(31)   the amount of EUR 28'000.00 to be paid on or before 16 March 2018

(32)   the amount of EUR 28'000.00 to be paid on or before 16 April 2018

(33)   the amount of EUR 28'000.00 to be paid on or before 16 May 2018

(34)   the amount of EUR 28'000.00 to be paid on or before 16 June 2018

(35)   the amount of EUR 28'000.00 to be paid on or before 16 July 2018

(36)   the amount of EUR 28'000.00 to be paid on or before 16 August 2018

(37)   the amount of EUR 28'000.00 to be paid on or before 16 September 2018

(38)   the amount of EUR 28'000.00 to be paid on or before 16 October 2018

(39)   the amount of EUR 24'000.00 to be paid on or before 16 November 2018.

ii.   Should Unifi fail to make its payments in line with this schedule and fail to cure the same according to clause 5 of the Settlement Agreement, Albtelecom shall be entitled to claim forthwith the amount of EUR 2'100'000.00 less any payments made under the Settlement Agreement and/or the present Award by Consent to that date.

iii.   All payments overdue under this Award by Consent shall bear interest at the rate of 2.5% per year.

iv.   The costs of the arbitration fixed by the ICC Court at its session of 13 August 2015 at USD 115'000.00 are borne by the Claimant.

v.   Each Party shall bear its own legal and other costs in relation with the Settlement Agreement and the arbitration proceedings.

Place of Arbitration: Zurich, Switzerland.

Date:   2 September 2015

The Sole Arbitrator:

Joachim Knoll

41

Fr. 2.50

Seen by the undersigned, Mr Guillaume Chappuis, a
duly authorized Notary Public in Geneva, for
legalization exclusively on the reverse side of the
signature of Mr Joachim KNOLL, who signed according
to the original sample of his signature filed in
his Office. The undersigned Notary assumes no
responsibility as to the content of the present
document.-----------------------------------------
Geneva, this 15th day of June 2016.------------------



## APOSTILLE
(Convention de la Haye du 5 octobre 1961)

1. Pays:  Suisse

Le présent acte public

2. a été signé par   Mr G. Chappuis.

3. agissant en qualité de   notaire

4. est revêtu du sceau/timbre de

Attesté

5. à Genève          6. le   15 JUIN 2016

7. République et Canton de Genève

8. sous N°

9. Sceau / timbre

10. Signature

Emmanuel Moar

